AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas
El Dorado Division

| | |
|---|---|
| US DISTRICT COURT WESTERN DIST ARKANSAS **FILED** 10/22/2021 | |

IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 842 BRADLEY ROAD 45, HERMITAGE, BRADLEY COUNTY, ARKANSAS

No. _____

1:21-cm-00014

**Filed Under Seal**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*:
**See "Attachment A"**

located in the Western District of Arkansas there is now concealed *(identify the person or describe the property to be seized)*:
**See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

[×] evidence of a crime;

[×] contraband, fruits of crime, or other items illegally possessed;

[×] property designed for use, intended for use, or used in committing a crime;

[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. § 843(b) | Use of a Communication Facility in Furtherance of a Drug Trafficking Offense |
| 21 U.S.C. § 846 | Conspiracy to Commit an Offense Defined in Title 21, United States Code, Sections 801—904. |

The application is based on these facts:   (See attached affidavit of TFO Houston Bradshaw, FBI)

[×]   Continued on the attached sheet.

[ ]   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

(Appearing by telephone conference call at 415-527-5035)
TFO Houston Bradshaw, Federal Bureau of Investigation
*Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: October 22, 2021

City and state: Texarkana, AR

_____
*Judge's signature*

Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 842 BRADLEY ROAD 45, HERMITAGE, BRADLEY COUNTY, ARKANSAS | No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Houston Bradshaw, being duly sworn, depose and state the following:

### INTRODUCTION

1.     Your Affiant, Houston Bradshaw, is an employee with the 13th Judicial Drug Task Force, where he is assigned as an agent. He is additionally assigned as a Task Force Officer with the El Dorado office of the Federal Bureau of Investigation, and has been for approximately the last 8 years. He is a certified law enforcement officer in the State of Arkansas with approximately 15 years of law enforcement experience, the last 5 having been spent working criminal investigations, predominately those involving trafficking, distribution, and possession of narcotics and dangerous drugs.   During the course of your Affiant's career, he has conducted/assisted in numerous narcotic investigations, resulting in the arrest and successful prosecution of individuals in both federal and state courts. During the course of those investigations, your Affiant has assisted with and executed numerous search warrants for narcotics, dangerous drugs, stolen property, records related to and proceeds derived from the illegal trafficking of narcotics. The following is based upon your Affiant's training, experience, and investigative findings.

2.      Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds.  I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.  I am familiar with the ways in which drug traffickers conduct their business – including the method and means in which they: obtain, manufacture, import, and distribute narcotics; make drug payments and launder drug proceeds; and communicate with organizational members.  My training and experience as a law enforcement officer, and my conversations with state, federal, and law enforcement officers in other countries form the basis of the opinions and conclusions set forth below.

3.      This affidavit is submitted in support of an application for a warrant authorizing a search of the premises located at 842 Bradley 45, Hermitage, Bradley County, Arkansas, which premises is more particularly described in Attachment A hereto, (hereafter the "SUBJECT PREMISES") for evidence of violations of Title 21, U.S.C. §§ 841(a)(1), 846, and 843(b).  The items to be searched for and seized are described more particularly in Attachment B hereto.

4.      I am familiar with the information contained in this Affidavit based upon the investigation I have conducted to date and based on my training and conversations with other law enforcement officers who have engaged in numerous investigations involving the possession and distribution of illegal controlled substances.

5.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

6. As a result of the investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including Title 21, U.S.C. §§ 841(a)(1), 846, and 843(b), are present at the SUBJECT PREMISES.

## DRUG TRAFFICKING CRIMES GENERALLY

7. Based upon your affiant's training, experience, and participation in other drug and financial investigations involving wholesale and retail amounts of controlled substances, as well as the knowledge and experience of other agents and police officers with whom your affiant has worked, your affiant knows:

a) That large-scale drug traffickers generate large amounts of currency from the drug trafficking activities and must have access to large amounts of currency to maintain and finance their on-going drug business. Large-scale drug traffickers often conceal this currency in locations such as their residence, businesses, safe deposit boxes, safes, or other locations where assets can be concealed. These locations may be in the name of the drug trafficker or in the name of relatives or close associates;

b) That in order to conceal profits from their drug trafficking activities drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities. That even though these assets are in names other than the drug traffickers', the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them;

c) That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale

and distribution of controlled substances.   That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their residences, businesses, vehicles, storage units and/or other locations over which they maintain dominion and control;

d)    That it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers.   These items are maintained by the drug traffickers within their residences, vehicles, businesses, storage units or other locations over which they maintain dominion and control;

e)    That large-scale drug traffickers often utilize electronic equipment such as cell phones, computers, telex machines, facsimile machines, text messaging devices, email, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described above;

f)    That large-scale drug traffickers often attempt to legitimize their profits from drug trafficking through various money laundering methods.   To accomplish these goals, drug traffickers utilize methods including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, and otherwise legitimate cash producing businesses;

g)     That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money"). It is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving trace residue of controlled substances on the "street money." Law enforcement agencies utilize dogs which are trained to detect and react to the odor of controlled substances and residue of controlled substances, and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences of drug traffickers. It is common for drug dealers to separate their "street money" by denomination and put this currency in banded stacks in varying increments to facilitate quick counting. Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

h)     That the currency transaction reports which are required to be completed and filed by financial institutions and businesses on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions or businesses. In order to avoid the filing of a currency transaction report, drug traffickers often "structure their currency transactions, that is, arrange a cash transaction exceeding $10,000 into smaller transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

i)     That businesses engaged in the sale or lease of vehicles are required to file currency transaction reports for cash transactions which aggregate over $10,000. These

businesses at times generate and/or accept large amounts of currency in the ordinary course of business. Certain of these businesses attempt to conceal the receipt of this currency by failing to file currency transaction reports or by structuring deposits of currency at financial institutions. Drug traffickers and others involved in criminal activity at times seek out businesses that fail to file currency transaction reports;

j)      That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other Federal, state, or local law enforcement agencies.  In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government.  The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

k)      That drug traffickers commonly maintain cellular phones, computers, text messaging devices, books or papers which reflect the names, telephone numbers, addresses and/or electronic email addresses  of their criminal associates in the trafficking organization;

l)      That wholesale quantities of powder drugs such as methamphetamine and cocaine are bought and sold in high purity form, so as to yield a maximum profit and to make the most efficient use of storage space. However, such drugs are not consumed by end users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level or form. High purity powder drugs are reduced in purity by the addition of adulterants such as mannitol, mannite, vitamin B12 and other such

adulterants. This process of diluting pure drugs for sale is commonly called "cutting" or "stepping on" the drug. Other equipment, such as weight scales, sifters, grinders, electric blenders, razor blades, glass panes, and mirrors, and the like are typically used in this adulterating process. Once the drug has been "cut,", the usual practice is to repackage it in smaller quantities for redistribution;

m)  That it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including paraphernalia used in the "cutting", weighing, "cooking", and packaging of controlled substances, in their residences and other locations which they maintain dominion and control over, and/or other locations where they conduct their criminal activity;

n)  That drug traffickers take or cause to be taken photographs and videos of themselves, their associates, their assets and their product. That these traffickers usually maintain these photographs and videos in their possession, or within their residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

o)  That drug traffickers keep in their residences items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

p)  That it is generally a common practice for drug traffickers to maintain in their residences and places of business records relating to their drug trafficking activities.

Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records (drug ledgers) to show balances due for drugs sold in the past ("pay"), and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers, and keep them immediately available in order to efficiently conduct their drug trafficking business;

q)     That it is a generally common practice for drug traffickers to make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with services to facilitate their illegal activities.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in a trafficker's residence, place of business, and/or other locations over which they maintain dominion and control;

r)     That drug traffickers often travel or pay and arrange for others to travel in furtherance of their drug trafficking activities including traveling to transport drugs and to transport currency derived from and/or related to the drug trafficking activities. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in their residences, places of businesses and/or their vehicles.  In addition, traffickers who travel or who contract others to travel on their behalf often communicate with their sources of supply prior to, during and after their travel.  Drug Traffickers typically leave records of these communications in various places including but

not limited to their cellular telephones, computers, text messaging devices, telephone answering machines, and handwritten notes.  These communication records are usually found in a trafficker's residence, stash location, place of business and/or their vehicles;

s)      That drug traffickers often keep the records and other items described above over long periods of time and may keep records in paper and/or electronic form.

## PROBABLE CAUSE

8.      Beginning in September 2021, the CHS provided information to your Affiant regarding a black male known to the CHS only as "Pooh Man," who the CHS said was distributing methamphetamine in the Hermitage, Arkansas area.  When the CHS initially informed your Affiant about "Pooh Man," the CHS had already been buying multi-ounce quantities of Methamphetamine from "Pooh Man" for the preceding several months, at "Pooh Man's" residence in Hermitage.

9.      The CHS told investigators that "Pooh Man's" cellular telephone number was 870-310-6801, and stated that they had also sometimes communicated with "Pooh Man" via Facebook Messenger, with "Pooh Man" using a Facebook profile under the name "Mustadda Shabazz." Based upon other information known to investigators, The CHS was provided a picture of Charmane Miller (hereinafter "MILLER") and was positively identified MILLER as the person they knew as "Pooh Man."

### Early September 2021 Controlled Buy

10.      In early September 2021, your Affiant was informed by the CHS that they could purchase 8 to 9 ounces of Methamphetamine from MILLER at MILLER's apartment in Hermitage Arkansas.  Your affiant instructed the CHS to meet him at a pre-determined location, in order to conduct a controlled purchase of Methamphetamine from MILLER.  Once there, investigators searched the CHS, and the CHS's vehicle, for any narcotics, moneys, and weapons, with none

being found, and provided the CHS $3,500.00 in U.S. Currency (official FBI controlled buy funds), with which to purchase the above-referenced Methamphetamine.  Investigators also equipped the CHS with one or more audio/video recording devices to capture the anticipated transaction with MILLER.  The CHS then drove from the pre-buy location to MILLER's apartment complex in Hermitage while under constant surveillance, both by investigators of the 13th Judicial Drug Task Force and by a helicopter operated by the Arkansas National Guard.

11.    Some time after the CHS arrived at MILLER's apartment complex in Hermitage, your Affiant received a text from the CHS, stating that the transaction was "Done."  The CHS was then instructed to come to your Affiant's location and follow your Affiant to a prearranged post-buy location.  The CHS did so and, once there, your Affiant took possession of the recording devices previously provided to the CHS.  The CHS then opened a small bag and removed a sandwich size plastic baggie that contained an estimated 225 grams of suspected Methamphetamine, which they turned over to investigators.  The CHS told investigators that, after they arrived at MILLER's apartment complex, MILLER told the CHS to meet him at a different location.  The CHS indicated they had purchased the suspected Methamphetamine from MILLER, in exchange for the above-described FBI buy funds, at that second location.  The CHS also stated that, earlier in the day, when the transaction was initially arranged, MILLER told the CHS that he was going to have to go to his "Unc's" house, to retrieve the narcotics.  The CHS was again searched for illegal narcotics, money and weapons, and none were found.  The substance purchased from MILLER during the above-described controlled buy was later subjected to a field test capable of detecting the presence of certain controlled substances, testing positive for the presence of Methamphetamine.

12.     Your Affiant later reviewed the recordings captured by the audio/video devices the CHS carried during the controlled buy described above. The video confirms that, after leaving the initial pre-buy location, the CHS drove directly to MILLER's apartment complex in Hermitage. The video shows the CHS sitting in the parking lot, communicating via text message.   Air surveillance thereafter observed the CHS's vehicle leaving the apartment parking lot and traveling to a second location.  Shortly after the CHS's vehicle arrived at the new location, the air team observed an older, grey truck arrive.  The CHS was seen exiting their vehicle and getting in the passenger's side of the truck.  The video from the recording devices carried by the CHS shows that, as the CHS was entering the truck, a sandwich baggie could be seen laying on the truck's seat.   That sandwich baggie appears to be the same baggie in which the CHS later gave investigators the Methamphetamine purchased from MILLER.  A man investigators identified as MILLER, from known photos and prior contacts with law enforcement, can be seen in the video, counting the U.S. Currency (FBI Buy Money) that had been provided earlier to the CHS.

### Late September 2021 Controlled Buy

13.     In late September 2021, your Affiant was again informed by the CHS that they could purchase 8 to 9 ounces of Methamphetamine from MILLER at MILLER's apartment in Hermitage Arkansas.  Your affiant again instructed the CHS to meet him at a pre-determined location, in order to conduct a controlled purchase of Methamphetamine from MILLER.  Once there, investigators searched the CHS, and the CHS's vehicle, for any narcotics, moneys, and weapons, with none being found, and again provided the CHS $3,500.00 in U.S. Currency (official FBI controlled buy funds), with which to purchase the above-referenced Methamphetamine. Investigators also again equipped the CHS with one or more audio/video recording devices to capture the anticipated transaction with MILLER.  The CHS then drove from the pre-buy location

to MILLER's apartment complex in Hermitage while under constant surveillance, both by investigators of the 13th Judicial Drug Task Force and by a helicopter operated by the Arkansas National Guard.

14.     Some time after the CHS arrived at MILLER's apartment complex in Hermitage, your Affiant received a text from the CHS, stating that the transaction was "Done." The CHS was then instructed to come to your Affiant's location and follow your Affiant to a prearranged post-buy location. The CHS did so and, once there, your Affiant took possession of the recording devices previously provided to the CHS. The CHS also then turned over to investigators a plastic grocery sack. Inside the grocery sack was a freezer bag that contained an estimated 224 grams of suspected Methamphetamine, which they turned over to investigators. The CHS told investigators that, when they arrived at MILLER's apartment complex, the CHS met MILLER in the parking lot and gave MILLER the referenced FBI buy money. The CHS stated that MILLER told them that he was going to get the narcotics, and would return in about 30 minutes. The CHS said that MILLER left and eventually returned to the apartment complex parking lot, at which time MILLER provided the CHS the above-referenced 224 grams of suspected Methamphetamine while the two sat in MILLER's truck. The CHS was again searched for illegal narcotics, money and weapons, and none were found. The substance purchased from MILLER during this late-September controlled buy, was later subjected to a field test capable of detecting the presence of certain controlled substances, testing positive for the presence of Methamphetamine.

15.     Your Affiant later reviewed the recordings captured by the audio/video devices the CHS carried during the late September controlled buy described above. The video, along with air surveillance, confirmed that the CHS drove directly to MILLER's apartment complex in Hermitage, upon leaving the initial pre-buy location,   The recordings captured by the CHS show

that, after they arrived in the complex lot, they exited their vehicle and met a man investigators knew (from known photographs and prior contacts) to be MILLER in an older Dodge truck. Surveillance units thereafter observed that grey Dodge truck leaving the apartment complex lot, and the air surveillance team was able to maintain surveillance on it as it traveled directly to the SUBJECT PREMISES. Aerial surveillance video then shows a man your Affiant has identified (from known photographs and prior law enforcement contacts) as MILLER getting out of the truck and approaching an orange traffic cone sitting near a mailbox. The video further shows MILLER removing a white bag from under the cone, which matches the general description of the bag in which the CHS later turned over the above-referenced Methamphetamine to investigators. The aerial surveillance team then observed MILLER leaving the area of the SUBJECT PREMISES in the grey truck and returning directly to the parking lot at MILLER's apartment complex. After MILLER arrived there, video shows that the CHS got out of their vehicle and met MILLER in MILLER's grey truck. Inside the truck, the recording device carried by the CHS captures a voice—not the CHS's voice, which is known to investigators—saying that's a "cutie" right there. Your affiant and other investigators know from training and experience that a "cutie" is a slang term commonly used by drug traffickers to refer to a quarter of a Kilogram (or roughly 249 grams). The CHS and MILLER are then seen entering an apartment at the complex for a short time, before leaving and each getting into their own vehicle. Video then shows the CHS leaving the apartment complex at approximately, and returning to meet investigators at the post-buy location.

### Investigation Regarding the Subject Premises

16.     Investigators have conducted ground surveillance around the area of the SUBJECT PREMISES. In so doing, they have been able to capture photos of the orange traffic cone located near a mailbox outside of the residence. In early September 2021, investigators also saw a vehicle

parked outside the residence which was displaying Arkansas license plate number (LPN) ADK25L. State records show that that LPN is registered to a Shelly Miller at the address of the SUBJECT PREMISES. Furthermore, investigators conducting surveillance in .MILLER's apartment complex parking lot, during the late September controlled buy described above, observed that the Dodge truck MILLER drove during that buy displayed Arkansas LPN 599ZWO. That license plate number is shown in state records to be associated with a silver Dodge pickup registered to a Michael Miller at the address of the SUBJECT PREMISES. From previous investigations, and prior contacts with law enforcement, investigators know that Michael Miller, (also known as "Big Mike") is MILLER's uncle. In light of the above evidence, investigators have concluded that Michael Miller is the person whom MILLER referred to as "Unc," when speaking to the CHS prior to the early September controlled buy, as described in paragraph 11, and with whom MILLER is working in his methamphetamine distribution enterprise.

**October 12, 2021, Controlled Buy**

17.     On October 12, 2021, your Affiant was again informed by the CHS that they could purchase multiple ounces of Methamphetamine from MILLER at MILLER's apartment in Hermitage Arkansas. Your affiant then again instructed the CHS to meet him at a pre-determined location, in order to conduct another controlled purchase of Methamphetamine from MILLER. Once there, investigators searched the CHS, and the CHS's vehicle, for any narcotics, moneys, and weapons, with none being found, and again provided the CHS $2,800.00 in U.S. Currency (official FBI controlled buy funds), with which to purchase the above-referenced Methamphetamine. Investigators also again equipped the CHS with one or more audio/video recording devices to capture the anticipated transaction with MILLER.

18.     While at the pre-buy location, the CHS placed a phone call to MILLER which was monitored by investigators. When the CHS dialed the number known to them as MILLER's, a female answered the call. The female told the CHS that MILLER was at his aunt's house. However, MILLER then got on the phone and told the CHS to meet MILLER at MILLER's residence. The CHS told MILLER that the CHS would be there in about 15 minutes. Thereafter, the CHS then drove from the pre-buy location to MILLER's apartment complex in Hermitage while under surveillance by multiple ground surveillance teams.

19.     Some time after the CHS arrived at MILLER's apartment complex in Hermitage, your Affiant received a text from the CHS, stating that the transaction was "Done." The CHS was then instructed to come to your Affiant's location and follow your Affiant to a prearranged post-buy location. The CHS did so and, once there, your Affiant took possession of the recording device(s) previously provided to the CHS. The CHS also then turned over to investigators a white sack containing an estimated 198 grams of suspected Methamphetamine. The CHS told investigators that, after they had arrived at MILLER's apartment complex, MILLER told the CHS to meet MILLER at a different location. The CHS indicated they had purchased the suspected Methamphetamine from MILLER, in exchange for the above-described FBI buy funds, at that second location. The CHS was again searched for illegal narcotics, money and weapons, and none were found. The substance purchased from MILLER during this October 12 controlled buy, was later subjected to a field test capable of detecting the presence of certain controlled substances, testing positive for the presence of Methamphetamine.

20.     Immediately before the October 12, 2021, controlled buy began, certain investigators had stationed themselves so as to provide ground surveillance inside MILLER's apartment complex. Shortly after the CHS spoke to MILLER on the phone, as described in

paragraph 18, those investigators saw MILLER drive out of the complex parking lot—this time behind the wheel of a Dodge Journey displaying Arkansas license plate number CLARJS. State records show that that LPN is registered to a Laporsha Tatum at 600 Walnut Street, Apt. D15, Hermitage, Arkansas, which is the address of MILLER's apartment complex, and of the specific apartment that investigators have seen MILLER entering and leaving. Your Affiant has also learned, in the course of this investigation, that Laporsha Tatum is MILLER's girlfriend.

21.     Around the same time, an Arkansas National Guard helicopter stationed in the area of the SUBJECT PREMISES captured video of a man walking out of the residence located on the SUBJECT PREMISES and placing something under an orange traffic cone near a mailbox. Your Affiant has identifed that man (from known photos and prior law enforcement contacts) as Michael Miller, MILLER's uncle. Thereafter, the helicopter was required to end its aerial surveillance and leave the area, due to an unfavorable weather forecast. However, after MILLER drove out of his apartment complex in the Dodge Journey, as described in paragraph 20, but before the CHS notified your Affiant that the deal was complete, investigators on the ground saw the same Dodge Journey (Arkansas LPN CLARJS) stopped in the driveway at the SUBJECT PREMISES. The approximate travel time between MILLER's apartment complex and the SUBJECT PREMISES, (known to investigators from having actually driven the route) indicates that MILLER drove the Dodge Journey directly to the SUBJECT PREMISES after investigators saw him leaving the complex.

## CONCLUSION

22.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of such criminal offenses may be located at the SUBJECT PREMISES described in Attachment A, in violation of Title 21,

U.S.C. §§ 841(a)(1), 846, and 843(b), Distribution of a Controlled Substance, Conspiracy to Distribute a Controlled Substance, and Use of a Communication Facility in the Distribution of a Controlled Substance.

23.     I, therefore, respectfully request that attached warrant be issued for the location described in Attachment A, and authorizing the search and seizure of the items listed in Attachment B.

_BAB_

(Appearing by telephone conference call at 415-527-5035)
Houston Bradshaw
Task Force Officer
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 22 day of October, 2021.

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is the premises located at:

**842 Bradley Road 45, Hermitage, Bradley County, Arkansas**

The premises includes a single-story residence with light colored siding and a rusted metal roof, situated on the west side of Bradley Road 45 in Hermitage, Bradley County, Arkansas. The dark colored front door of the residence faces Bradley Road 45, and is accessed via a raised wooden porch. The residence also has three (3) windows facing Bradley Road 45. Following is a photograph of the residence situated on the premises:



The premises includes all rooms within the above-described residence, as well as any closets, cabinets, safes, or containers located therein.

The premises also includes: 1) the curtilage of the above-described residence, 2) the parcel of real property on which the residence is situated (including any portion thereof which is not within the curtilage of the above-described residence), 3) any driveway, path, sidewalk, or other means of physical access to any part of the parcel of real property on which the above-described residence is situated, and 4) any and all any sheds, garages, outbuildings, vehicles, or containers located within the above-described areas, or which are apparently associated with the above-described residence.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.      Items evidencing violations of Title 21, U.S.C. §§ 841(a)(1), 846, and 843(b),

Distribution of a Controlled Substance, Conspiracy to Distribute a Controlled Substance, and

Use of a Communication Facility in the Distribution of a Controlled Substance, including but not

limited to the following:

      a.   Methamphetamine and drug paraphernalia including but not limited to weight scales, packaging material, adulterants used for "cutting", ammonia and/or sodium bicarbonate (baking soda) for "cooking" crack cocaine, and items used in the distribution of cocaine;

      b.   All documents, records and property (whether in the form of printed documents or stored in electronic or digital form) that constitute instrumentalities, fruits, or evidence of the commission of the offenses of Distribution and Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, including but not limited to the following:

            (1)   Buyer lists, seller lists, ledgers, or financial records relating to the purchase, sale, or distribution of controlled substances, and drug paraphernalia including but not limited to weight scales, cutting agents and packaging material;

            (2)   Books, records, receipts, notes, bank statements, and other bank records, money drafts, letters of credit, money orders, cashier's checks, and other monetary instruments, passbooks, bank checks; safe deposit box keys and records, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of proceeds from the sale of controlled substances; items providing evidence pertaining to money laundering, and documentation indicating the expenditure of the proceeds of narcotics distribution to acquire assets including but not limited to the purchase of vehicles, clothing, furniture, and electronic equipment;

            (3)   U.S. currency and currency equivalents such as cashier's checks, traveler's checks, money orders, and bank drafts; or precious metals, diamonds, gemstones, jewelry and other types of valuable items that may be deemed proceeds from drug trafficking and/or involved in money laundering.

(4)    Indicia of occupancy, residency, and/or ownership of property including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

(5)  Papers, tickets, notes, schedules, receipts, and other items relating to domestic or international travel;

(6)  . Photographs in paper or digital form and/or videos of the subjects of the investigation, co-conspirators, assets, or controlled substances;

(7)    Cellular telephones, pagers, or other electronic devices or documents which reflect names, addresses, telephone numbers, contact information, correspondences, text messages and or emails of subjects of the investigation, their criminal associates, sources of supply, customers, and financial institutions;

(8)  Counter-surveillance equipment;

2.    During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.